# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | WILLIAM T. HART | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 90 C 4984, 90 C 0950 | DATE | AUGUST 9, 2001 |
| CASE TITLE | ROBERT PETIT, et al. Vs. CITY OF CHICAGO, etc.; ANN ERWIN, et al. v. CITY OF CHICAGO, etc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Plaintiffs' motions to compel 1987 revisionist lieutenant's promotion list [283-1, 285-1] and to identify expert witnesses for operational necessity defense [289-1] are denied without prejudice. Plaintiffs' motions for collateral estoppel [286-1, 288-1] are denied.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | 6 | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | AUG 1 3 2001 | | |
| | Notified counsel by telephone. | | date docketed | | 264 |
| | Docketing to mail notices. | | | docketing deputy initials | |
| | Mail AO 450 form. | FILED FOR DOCKETING | AUGUST 9, 2001 | | |
| | Copy to judge/magistrate judge. | 01 AUG 10 PM 5: 26 | date mailed notice | | |
| CW | courtroom deputy's initials | Date/time received in central Clerk's Office | MQM | mailing deputy initials | |

DOCKETED

AUG   2001

| | |
|---|---|
| ROBERT PETIT, et al., | ) |
|               Plaintiffs, | ) |
|         v. | )    No. 90 C 4984 |
| CITY OF CHICAGO, a municipal corporation, | ) |
|               Defendant. | ) |

------------------------------------

| | |
|---|---|
| ANN ERWIN, et al., | ) |
|               Plaintiffs, | ) |
|         v. | )    No. 90 C 0950 |
| CITY OF CHICAGO, a municipal corporation, | ) |
|               Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Before the court are two cases involving promotions in the Chicago Police Department ("CPD") and allegations that White police officers were discriminated against in the process. The _Petit_ case (90 C 4984) involves promotions to sergeant based on a 1985-88 sergeant promotional examination that produced a 1988 eligibility list used between December 1988 and September 1991. The results of this examination were adjusted for race and there were also out-of-rank-order promotions of Hispanics and women.[1]

---

[1]For brevity in writing, the racial, national origin, and gender discrimination in the cases will be referred to as "racial" discrimination. The test score adjustments based on

See generally Petit v. City of Chicago, 31 F. Supp. 2d 604 (N.D. Ill. 1998).  The Erwin case (90 C 950) involves promotions to lieutenant based on a 1987 examination that produced a 1988 eligibility list used from March 1988 through September 1991. The 1988 eligibility list was standardized for race[2] and, additionally, racial promotions were made in 1990 and 1991.  See generally Erwin v. Daley, 92 F.3d 521 (7th Cir. 1996), cert. denied, 519 U.S. 1116 (1997); Erwin v. City of Chicago, 1998 WL 704295 (N.D. Ill. Sept. 30, 1998).

The Reynolds case (90 C 5456)[3] also involves lieutenant promotions based on the 1987 lieutenant examination.  Seventeen of the Reynolds plaintiffs are White males who took the 1987 lieutenant examination.[4]  The Reynolds plaintiffs only challenged the racial promotions to lieutenant; they did not challenge the racial standardization of the 1988 lieutenant list.  See generally Erwin v. Daley, supra; Reynolds v. City of Chicago, No. 90 C 5456 (N.D. Ill. Aug. 29, 2000) (Docket Entry 164)

race will be referred to as "racial standardization" and the out-of-rank-order promotions will be referred to as "racial promotions."

[2]Scores were adjusted for African-American and Hispanic applicants; no score adjustment was made for being a woman.

[3]The Petit and Erwin plaintiffs, as well as the plaintiffs in a case involving promotions to detective (Majeske v. City of Chicago, No. 89 C 7262 (N.D. Ill.)), are all represented by the same counsel.  Different counsel represented the plaintiffs in Reynolds.

[4]Three other Reynolds plaintiffs were White males seeking promotion to captain.  Unless otherwise indicated, further discussion of Reynolds will be limited to the lieutenant claims.

("Reynolds II"); Reynolds v. City of Chicago, No. 90 C 5456
(N.D. Ill. March 30, 2000) (Docket Entry 150) ("Reynolds I").
Presently pending are plaintiffs' motions to apply collateral
estoppel based on rulings contained in Reynolds I.[5]

The Reynolds case was bifurcated as to liability and
damages. In March and April 1999, a jury trial was held as to
liability in the Reynolds case. The jury returned special
verdicts in which it made findings on 23 questions. Thereafter,
the parties briefed the issue of whether the special verdicts
were supported by the evidence and also briefed the issue of
additional determinations the court should reach in light of the
special verdicts. Reynolds I contains the initial rulings on
those issues.

Based on Reynolds I, plaintiffs contend that, in both the
Petit and Erwin cases, the City should be estopped from denying
the following:[6]

> (a) As of 1990, there were no lingering
> effects from the CPD's past discrimination in
> hiring Hispanics.
> (b) After 1975, the CPD did not discriminate
> in hiring Hispanics and African-Americans.

---

[5]At the June 13, 2001 hearing, plaintiffs' motions to
compel revisionist lieutenant promotion list were entered and
continued so that the parties could attempt to resolve the
dispute. There being no indication the parties could not resolve
that issue, those motions will now be denied without prejudice.
Plaintiffs' motion to require defendants to identify their
operational necessity witnesses is denied without prejudice to
objecting to any witnesses listed in the final pretrial order.

[6]The asserted grounds for estoppel will be referred to as
"Issue (a)," "Issue (b)," etc.

- 3 -

> (c) After 1975, medical grounds for
> rejection by the CPD did not have a disparate
> effect on African-Americans.
> (d) Derogatory comments and treatment of
> women existed in the CPD both before and after
> 1975.

Additionally, in the Erwin case only, plaintiffs contend the City

should be estopped from raising:

> (e) A defense based on, as of 1990, there
> being a need to remedy the lingering effects of
> past CPD discrimination against Hispanics.
> (f) The City's operational needs defense.

The racial promotions that affected the Reynolds

plaintiffs involved the out-of-rank-order promotion of eleven

African-Americans, five women, and one Hispanic. Reynolds I,

at 4. The City had the initial burden of production with respect

to its proffered justifications for the racial promotions. Id.

at 7. The City had to establish that there existed a strong

basis in the evidence that remedial action was necessary.[7] Id.

The burden of proof, however, remained with plaintiffs to

establish the City's racial promotions were unconstitutional.

Id. at 7-8.

One justification for the racial promotions that was

offered by the City was its "operational needs," which consisted

of both external needs and internal needs. The claimed external

needs were that, to be effective, a police force had to be

diverse so as to be able to gain the trust and cooperation of the

---

[7]A different, less burdensome, standard applied to the
gender discrimination. Reynolds I, at 8.

community.  The claimed internal need was that, for effective
management, the supervisory ranks needed to reflect the diversity
that existed in the ranks below.  See Reynolds I, at 9-10.  It
was not claimed that external operational needs were a basis for
the racial promotions of women.  See id. at 11.  The court found
that the City failed to establish a strong basis in the evidence
that the racial promotions to lieutenant were necessary because
of the CPD's internal operational needs.  Id. at 11, 14.  The
court also found that the City failed to establish a strong basis
in the evidence that the racial promotions were justified by the
CPD's external operational needs.  Id. at 12-14.

The other justification for the racial promotions that
was offered by the City was that they were justified as a remedy
for past discrimination in hiring and promotions (the "remedial
defense").  As to the racial promotion of the one Hispanic, the
court noted that the City had conceded that there was adequate
evidence to support the jury's finding that, as of 1990, there
was no underrepresentation of Hispanic lieutenants resulting from
past discrimination.  The City contended the evidence also would
have supported a contrary finding, but acknowledged that, in such
situations, the jury's verdict cannot be overturned.  In light of
this factual finding, no remedial defense existed justifying the
racial promotion of the one Hispanic.  See Reynolds I, at 14-15.

As to the promotions of 11 African-Americans, the court
held the City met its "burden of showing a strong basis in the
evidence for [its] conclusion that remedial action was necessary

because of the lingering effects of past intentional discrimination in hiring by the CPD." Reynolds I, at 17. In reaching this conclusion, the court primarily relied on statistical projections that, as of 1990, there would have been 28 more African-American lieutenants if not for discrimination.[8] Id. at 16. Cf. Petit v. City of Chicago, 2001 WL 629306 *9-11 (N.D. Ill. May 25, 2001) ("Petit V") (discussing similar statistical analysis of underrepresentation in the sergeant ranks).

> With respect to this issue, defendant presented evidence of several types. The centerpiece of defendant's evidence was the statistical analysis performed by defendant's statistical expert, Bernard Siskin. **After 1975, it is agreed that the CPD's hiring was non-discriminatory, as a result of an order by a judge of this court.** Siskin's analysis utilized the post-1975 numbers to establish benchmarks for the period before 1975, and then compared actual hiring before 1975 with the benchmarks. Prior to 1975, hiring of blacks fell well below the benchmark rates. Siskin's analysis concluded that if blacks had been hired in the benchmark numbers prior to 1975, there would in 1990 have been 28 more black lieutenants and 21 more black captains on the CPD. **Evidence was also presented showing that blacks were rejected on medical grounds greatly in excess of whites before 1975, but that the disparity vanished after 1975.** There was anecdotal evidence which tended to establish that after being hired, black officers were subject to intentional discrimination in assignments and that supervisors acted in ways

---

[8]At the subsequent retrial, the statistical analysis was refined in light of additional information regarding the pool of applicants and the jury's finding of no discrimination during the promotion process itself. With those revisions, the statistical expert estimated the underrepresentation was 24 at the end of 1989, 22 at the end of 1990, and 20 at the end of 1991. See Reynolds II, at 5-6.

that were hostile to, or tolerated acts of
hostility toward black officers.

Reynolds I, at 16 (emphasis added).  The court rejected

plaintiffs' attempts to explain away or discount this evidence.

Id. at 16-17.

However, despite this evidence and a number of findings

by the jury that were favorable to the City, the court reached no

conclusion as to the remedial defense as a justification for the

racial promotions of 11 African-Americans because two of the

jury's special verdicts were inconsistent.  The court held that

the inconsistency required that a new trial be held on this

issue.  Reynolds I, at 18-19.

As to the racial promotion of five women, the court held

the City met its burden of establishing a sufficient basis to

justify the need for the out-of-rank-order promotions of five

women.  Reynolds I, at 20.

> . . . The evidence was that prior to 1975
> City policy prohibited women from becoming
> patrolmen.  They were not permitted to take the
> patrolman entry examination, and were allowed to
> compete only for a limited number of police
> matron and policewoman positions.  Prior to 1973,
> women were prohibited from taking promotional
> examinations.  **Further, there was evidence of
> derogatory comments and treatment of women by
> supervisors or tolerated by supervisors both
> before and after women were permitted to become
> patrol officers in 1975.**  Finally, the evidence
> was that in 1990 there were only 7 females among
> the total of 307 CPD lieutenants.  Siskin's
> statistical analysis indicated there was a
> shortfall of 52 female lieutenants compared to
> what would have been expected based on the
> benchmarks established by using the actual
> numbers of women hired in the nondiscriminatory

period after 1975.  The court concludes there was
a strong basis in the evidence for defendant's
conclusion that the out-of-rank promotions of 5
women to lieutenant was necessary to remedy the
lingering effects of past intentional
discrimination in hiring by the CPD.

Id. (emphasis added).  Except for one special verdict, the jury

found for the City on this issue.  See id. at 20-21.  As to the

one contrary special verdict (No. 13), the court held that it was

unsupported by the evidence.  Id. at 21.  The court found that

the City was entitled to a judgment in its favor as to the racial

promotion of five women to lieutenant.  Id.  On April 6, 2000,

the court made additional findings that, as to the racial

promotion of women, the remedy was narrowly tailored.  See

Reynolds v. City of Chicago, No. 90 C 5456 (N.D. Ill. April 6,

2000) (Docket Entry 154).

Reynolds I concludes:

ORDERED:  Defendant's motion for judgment as
a matter of law [115] and renewed motion for
judgment as a matter of law [134] are granted in
part and denied in part.  Judgment as a matter of
law is granted with respect to Special Verdict
No. 13 and denied in all other respects.
With respect to liability:
1.    Plaintiffs are entitled to judgment on the
operational needs defense.
2.    With respect to the remedying-of-lingering
effects-of-past-discrimination defense:
        a.    Plaintiffs are entitled to judgment
              with respect to the one Hispanic who
              was promoted out-of-rank order to
              lieutenant.
        b.    Defendant is entitled to judgment with
              respect to the 5 women who were
              promoted out-of-rank order to
              lieutenant.
        c.    A new trial is ordered with respect to
              the 11 blacks who were promoted to

> lieutenant and the 3 blacks who were
> promoted to captain out-of-rank order
> solely on the remedying-of-the-
> lingering-effects-of-past-
> discrimination defense.

<u>Reynolds I</u>, at 21-22.

The <u>Reynolds</u> parties subsequently agreed that the court, not a jury, would hear the additional evidence pertinent to the remaining issue of whether the racial promotions of African-Americans were justified by the remedial defense. The court thereafter issued its rulings based on the retrial evidence, the evidence presented at the original trial, the jury's special verdicts, and some additional stipulations or agreements of the parties. <u>See</u> <u>Reynolds II</u>, at 2-3. The parties "agreed that, with respect to the remedial defense, past racial discrimination in hiring [of African-American patrol officers] was established by the jury verdict, and the sole issue before the court was whether the remedy employed by defendant was narrowly tailored to defendant's past racial discrimination in hiring" African-American patrol officers. <u>Id.</u> at 3.

In <u>Reynolds II</u>, the court again found that the city satisfied its burden of production as to the African-American racial promotions being narrowly tailored. <u>Id.</u> at 8-9. The court credited Siskin's analysis including the refinements presented at the retrial. <u>See</u> <u>id.</u> at 10-11. The court concluded that the African-American racial promotions for lieutenant were

narrowly tailored:

> . . . At the end of 1989, prior to the out-
> of-rank order promotions, there were 24 less
> black lieutenants than would have been expected
> if there had been no hiring discrimination. At
> the end of 1991, after all of the out-of-rank
> promotions were made, there were still 20 less
> black lieutenants than would have been expected
> if there had been no hiring discrimination. In
> other words, if defendant had not made the 11
> out-of-rank order promotions that it did, there
> would have been a shortfall of 31 black
> lieutenants in the CPD in 1991. The 11 out-of-
> rank order promotions of Blacks to lieutenant
> then easily constituted a plausible lower-bound
> estimate of the shortfall in minority
> representation at the lieutenant's rank caused by
> past hiring discrimination in the CPD.

Id. at 12. The court ordered: "Defendant City of Chicago is
entitled to judgment with respect to the 11 blacks who were
promoted out-of-rank order to lieutenant . . . on the remedying-
of-the-lingering-effects-of-past-discrimination defense." Id.
at 14.

Subsequently, a stipulation was reached regarding the
amount of damages suffered by the one plaintiff who would have
been hired if the one Hispanic had not received a racial
promotion. See Reynolds v. City of Chicago, No. 90 C 5456 (N.D.
Ill. Sept. 13, 2000) (Docket Entry 165) (joint motion of
defendant City of Chicago and plaintiff Harold Dennis for entry
of proposed order regarding plaintiff Harold Dennis). On
September 22, 2000, judgment was entered in favor of the City as
to all defendants except Dennis. As to Dennis, a judgment was
entered in his favor awarding him back pay, a promotion to

lieutenant, and consistent adjustments to his pension. Also incorporated in the judgment is the parties' agreement that enforcement of Dennis's judgment is stayed pending an appeal by the City. See Reynolds v. City of Chicago, No. 90 C 5456 (N.D. Ill. Sept. 20, 2000) (Docket Entry 166). Both sides appealed and the case is presently being briefed on appeal.

Ordinarily, four elements must be satisfied in order to apply collateral estoppel based on a prior federal court judgment. "1) the issue sought to be precluded must be the same as that involved in the prior action, 2) the issue must have been actually litigated, 3) the determination of the issue must have been essential to the final judgment, and 4) the party against whom estoppel is invoked must be fully represented in the prior action." La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V., 914 F.2d 900, 905-06 (7th Cir. 1990). Accord Petit v. City of Chicago, 1999 WL 66539 *4 (N.D. Ill. Feb. 8, 1999) ("Petit III"). Because the present invocation of collateral estoppel is nonmutual and offensive, it must also be considered whether these are appropriate circumstances for applying collateral estoppel. See Parklane Hosiery Co. v. Shore, 439 U.S. 322 (1979); Chicago Truck Drivers, Helpers & Warehouse Union (Independent) Pension Fund v. Century Motor Freight, Inc., 125 F.3d 526, 530 & n.3 (7th Cir. 1997).

In deciding whether to apply nonmutual offensive collateral estoppel, the situation is examined to determine whether certain factors counsel against its application.

> First, its application could create an incentive
> for potential plaintiffs "to adopt a 'wait and
> see' attitude, in the hope that the first action
> by another plaintiff will result in a favorable
> judgment," since such plaintiffs "will be able to
> rely on a previous judgment against a defendant
> but will not be bound by that judgment if the
> defendant wins." [Parklane,] 439 U.S. at 330.
> Second, offensive use of collateral estoppel may
> be "unfair to a defendant," to the extent that:
> (1) the defendant may have been sued in the first
> action for "small or nominal damages" for which
> "he may have [had] little incentive to defend
> vigorously"; (2) the "judgment relied upon as a
> basis for the estoppel is itself inconsistent
> with one or more previous judgments in favor of
> the defendant"; or (3) "the second action affords
> the defendant procedural opportunities [e.g.,
> discovery procedures] unavailable in the first
> action that could readily cause a different
> result." Id. at 330-31.

Century Motor, 125 F.3d at 531.

If those factors do not counsel against applying
collateral estoppel, it still must be considered "whether because
of 'other reasons, the application of offensive estoppel would be
unfair.'" Id. (quoting Parklane, 439 U.S. at 331). For example,
nonmutual offensive collateral estoppel should not be applied to
legal questions where it forecloses the opportunity to develop
the law, particularly where it involves legal questions of
general interest that have not been resolved by the highest
appellate court. Id. Whether it is fair to apply nonmutual
offensive collateral estoppel is to be determined on a case by
case basis with deference to the practical realities faced by the
parties. Century Motor, 125 F.3d at 531 (quoting Butler v.
Stover Brothers Trucking Co., 546 F.2d 544, 551 (7th Cir. 1977)).

See also <u>Abbott Laboratories v. Dey, L.P.</u>, 110 F. Supp. 2d 667, 670 (N.D. Ill. 2000).

In <u>United States v. Mendoza</u>, 464 U.S. 154 (1984), the Supreme Court limited the application of nonmutual offensive collateral estoppel as against the federal government. The court considered that the federal government is frequently engaged in litigation and more likely to be involved in recurring legal issues; applying the rule to a national government would preclude the possibility of different jurisdictions developing the law before it reached the Supreme Court; the government has limited resources and takes prudential considerations into account in declining to pursue appeals; and changes of administration can impact on litigation decisions. <u>See id.</u> at 159-161. The City contends similar reasoning applies to municipalities.

Even as to the federal government, <u>Mendoza</u> is not clear as to its limitation on collateral estoppel. <u>Mendoza</u> likely does not apply to specific fact determinations not embracing policy choices and legal issues. <u>See Mendoza</u>, 464 U.S. at 162; <u>Adkins v. Commissioner</u>, 875 F.2d 137, 141 (7th Cir. 1989); <u>Wolff v. Commissioner</u>, T.C. Memo. 1994-196 (U.S. Tax Ct. 1994); <u>Colorado Springs Production Credit Association v. Farm Credit Administration</u>, 666 F. Supp. 1475, 1477-78, <u>reconsideration denied</u>, 669 F. Supp. 1044, 1046-47 (D. Colo. 1987), <u>appeal dismissed</u>, 848 F.2d 200 (8th Cir. 1988). To the same extent it applies to the federal government, <u>Mendoza</u> may also apply to suits against a state government or its agencies. <u>See Hercules</u>

<u>Carriers, Inc. v. Claimant State of Florida</u>, 768 F.2d 1558, 1578-79 (11th Cir. 1985). <u>See also</u> <u>Chambers v. Ohio Department of Human Services</u>, 145 F.3d 793, 801 n.14 (6th Cir.), <u>cert. denied</u>, 525 U.S. 964 (1998) (<u>dictum</u>); <u>Milton S. Kronheim & Co. v. District of Columbia</u>, 91 F.3d 193, 205 (2d Cir. 1996), <u>cert. denied</u>, 520 U.S. 1186 (1997) (Silberman, J., concurring). The same rules, though, may not apply to municipalities, the boundaries of which generally do not cover multiple judicial jurisdictions. <u>See</u> Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, <u>Federal Practice & Procedure</u> § 4465 Supp. at 594 n.60.5 (2001 Supp.) ("It seems likely that municipalities will be treated as ordinary litigants, not as 'governments,' for purposes of nonmutual preclusion just as happens for many other purposes."). Also, in the present situation, there has been no change of administration since the <u>Reynolds I</u> or <u>Reynolds II</u> decisions and the City has expended substantial resources to litigate and appeal the pertinent claim that it lost in the <u>Reynolds</u> case.

Although only one plaintiff in the <u>Reynolds</u> case succeeded on his claim, his recovery was substantial, with backpay (including prejudgment interest) totaling $125,000. In any event, the City's defense of this claim has been vigorous, including appealing the judgment obtained by the one plaintiff. This is not a situation where the application of collateral estoppel should be precluded because the City had little incentive to oppose the prior lawsuit. At least as to issues

specific to lieutenant promotions, this is not a situation where there has been multiple and inconsistent prior rulings. The Reynolds and Erwin cases are apparently the only cases challenging the 1988 lieutenant list. The Erwin case has not yet gone to judgment and there are not any prior and inconsistent interlocutory rulings regarding the specific lieutenant issues on which estoppel is invoked. There also appear to be no material procedural differences between the cases. As a matter of fact, the cases were consolidated for the limited purpose of coordinated pretrial discovery, so all the cases have the same available evidence. Some of the issues on which estoppel is invoked go beyond facts specific to lieutenant promotions.[9] A detectives case involving the same time period and similar allegations has also gone to judgment. See Majeske v. City of Chicago, 218 F.3d 816 (7th Cir. 2000), cert. denied, 121 S. Ct. 779 (2001). There is no contention by the city that the Majeske case involved findings that are inconsistent with those for which the present plaintiffs seek collateral estoppel.[10]

_____

[9]These are issues (a) through (d) recited above for which estoppel is also sought as to the Petit case.

[10]As to one of the issues for which preclusion is invoked, the City's expert in the Petit case made a similar assumption. See Petit V, 2001 WL 629306 at *9 ("Siskin assumed that hiring discrimination had been eliminated by 1975."). As to another of the issues, the City previously did not dispute part of it. See id. at 11 ("The parties do not dispute that, prior to 1975, women were almost entirely excluded from employment as sworn officers of the Chicago Police Department."). In Reynolds I, at 15, it was found that, as of 1990, past discrimination in hiring Hispanics had not resulted in an underrepresentation of Hispanics at the lieutenant rank. In

The City does contend that the _Erwin_ plaintiffs
purposefully adopted a wait and see attitude in hopes of
benefitting from findings in _Reynolds_. The City points to the
_Erwin_ plaintiffs' opposition to the City's 1998 motion to have
_Reynolds_ consolidated with _Erwin_ for purposes of trial. In their
opposition brief, plaintiffs state that the _Reynolds_ case was
already set for trial and that the _Erwin_ case, when ready, would
be more efficiently tried because the city would be bound by any
rulings against it in _Reynolds_. See Pl. Objection to Motion for
Relatedness at 1-2 (Docket Entry 219). This is simply a
statement of a possible effect, not conclusive evidence that the
_Erwin_ plaintiffs intentionally attempted to take advantage of a
wait-and-see approach. An important indication that they did not
take such an attitude is that the _Erwin_ plaintiffs filed their
lawsuit in February 1990, whereas the _Reynolds_ case was not filed
until September 1990. Early in the proceedings, the Executive
Committee determined that the cases should be consolidated for
coordinated discovery only, not for trial. The city waited until
1998 (eight years) before moving to have the _Reynolds_ case
reassigned to the same judge who was presiding over the _Erwin_
case. At that time, it was found that the _Reynolds_ case should

---

_Majeske_, during the pertinent time period, it was found that an
underrepresentation of Hispanics continued to exist at the
detective rank. 218 F.3d at 820-21. On summary judgment in
_Petit_, evidence supported that an underrepresentation of
Hispanics continued to exist at the sergeant rank during the
pertinent time period. See _Petit V_, 2001 WL 629306 at *9. Since
the _Majeske_ and _Petit_ findings involve promotions to ranks other
than lieutenant, they are not inconsistent with _Reynolds_.

not be reassigned because the two cases involved some different claims (<u>Reynolds</u> did not challenge racial standardization and it also involved captain promotions) and because <u>Reynolds</u> had already been set for trial whereas <u>Erwin</u> was not yet ready for trial. <u>See Erwin</u> Order dated January 20, 1999 (Docket Entry 247). <u>See also</u> <u>Erwin v. City of Chicago</u>, 1998 WL 801830 (N.D. Ill. Nov. 12, 1998) (magistrate judge's recommendation). This court has expressly found that it was inappropriate to join the <u>Reynolds</u> and <u>Erwin</u> plaintiffs into a single case for trial and the <u>Erwin</u> plaintiffs did not delay bringing their lawsuit in order to take advantage of possible favorable <u>Reynolds</u> rulings. It will not be found that the <u>Erwin</u> plaintiffs engaged in procedural maneuvering that would make it unfair to apply collateral estoppel.

The City also contends it is unfair to permit plaintiffs to take advantage of plaintiff-favorable findings in <u>Reynolds</u> while not being bound by the defendant-favorable findings in <u>Reynolds</u>. The City does not cite any case law supporting that a judgment must be entirely against a party before nonmutual offensive collateral estoppel may be applied against that party. That is part of the nature of applying collateral estoppel in nonmutual situations; the estoppel can only be applied against the party that participated in the prior litigation. That is why, in the nonmutual situation, it must be additionally considered whether application of collateral estoppel is fair-- the mixed result is not itself an automatic reason for declining

to apply collateral estoppel. Under the present circumstances, such application is not found to be unfair. The City has known for a number of years that rulings in one of the CPD discrimination cases might have a preclusive effect on one or more of the other cases. Moreover, since discovery was coordinated, the same evidence that was available to the City at the Reynolds trial is the evidence that will be available at the Erwin and Petit trials. The City had every incentive and opportunity to present its best case at the Reynolds trials.[11] Plaintiffs, though, have not yet had the opportunity to present their best case—their presentation and strategy may differ significantly from the Reynolds plaintiffs who were represented by different counsel. Additionally, the City has urged the court to reach the limits of privity so as to apply collateral estoppel against the Erwin and Petit plaintiffs based on litigation in which some plaintiffs were not parties per se. See Petit V, 2001 WL 629306 at *2-5; Petit v. City of Chicago, 766 F. Supp. 607, 611-13 (N.D. Ill. 1991). It is not unfair to reach the limits of nonmutual offensive collateral estoppel, as well, especially since the cases under consideration have had a continuous link of coordinated discovery and other attempts at coordination. The split nature of the verdict in Reynolds is not a basis for

---

[11]Although the Reynolds case only concerned racial promotions, other than the precise time periods and promotions affected, the issues on which plaintiffs seek collateral estoppel would not have been tried any differently if racial standardization had also been at issue in the Reynolds case.

finding the application of collateral estoppel to be unfair in the present circumstances.

Last, this is not a situation where it would be inappropriate to apply collateral estoppel because it would limit the development of the law. The Reynolds case is already on appeal before the Seventh Circuit; the Seventh Circuit, not the district court, is the court that will establish binding precedent. More importantly, plaintiffs seek to apply collateral estoppel on purely factual issues. The City argues that the law regarding its operational needs defense is not well developed. That may be true. In Reynolds though, the City's operational needs defense was not rejected on legal grounds; it was rejected because the City failed to prove the facts it alleged as its defense. Similarly, the City failed to convince the jury that there was an underrepresentation of Hispanics at the lieutenant rank in 1990. No legal dispute was involved in this finding.

The City also contends that it should be considered that the Reynolds judgment is on appeal. It concedes that a judgment being on appeal does not prevent application of collateral estoppel, see Petit III, 1999 WL 66539 at *5, but contends that it is a factor that can be weighed in deciding whether to apply nonmutual offensive collateral estoppel. That, however, would be inconsistent with the well established rule that the pendency of an appeal does not affect the application of collateral estoppel. At most, the pendency of the appeal would be a reason to delay a

trial pending resolution of the appeal.  See id. at *5 n.9;
Petit V, 2001 WL 629306 at *1.

For the foregoing reasons, it would be fair to apply
nonmutual offensive collateral estoppel against the City based on
the judgment entered in the Reynolds case.  However, it still
must be considered whether the four elements for collateral
estoppel are satisfied as to each of the six issues on which
plaintiffs invoke collateral estoppel.  The fourth element, that
the City was fully represented in the prior action, is satisfied
as to each issue.  As to the other elements, each issue must be
considered.

Issue (a) (no lingering effect of discrimination against
Hispanics) and Issue (e) (no defense based on remedying the
lingering effects of Hispanic discrimination) will be considered
together since Issue (a) is the factual predicate for Issue (e).
First, it is clear that Issue (a) cannot apply to the Petit case
which, unlike Reynolds and Erwin, involves promotions to
sergeant.  Whether there was a lingering effect of discrimination
in the lieutenant ranks is not an issue involved in the Petit
case.  Therefore, Issue (a) clearly cannot be a basis for
applying collateral estoppel against the City in the Petit case.

Whether there was a shortfall of Hispanic lieutenants as
of 1990 is an issue in the Erwin case.  However, it is part of a
larger issue.  Because the Reynolds plaintiffs only challenged
the racial promotions that occurred in 1990 and 1991, the

underrepresentation evidence in that case focused on 1990.[12]  No findings were made regarding whether an underrepresentation of Hispanics existed in 1988 and 1991 when promotions were also made from the racially standardized 1988 eligibility list.  Thus, even if the City is estopped from claiming an underrepresentation of Hispanic lieutenants existed as of sometime in 1990, it will not be estopped from presenting evidence regarding other years. Also, the City will not be estopped from presenting evidence of underrepresentation of African-American and female lieutenants for all pertinent years.  Eliminating the issue of Hispanic underrepresentation for one year (or one date in one year) would not significantly save judicial and legal resources, which is one of the purposes of collateral estoppel, and may confuse the jury which would still hear evidence regarding representation in the Hispanic ranks during the time period before and after 1990. Under these circumstances, it would be inappropriate to apply collateral estoppel as to Issue (a) even if all of its elements are otherwise satisfied.  See Charles Alan Wright, Arthur R.

---

[12]The parties do not clarify whether the Reynolds jury was instructed or otherwise informed regarding what was meant by "1990."  Did the special verdict of the jury mean as of: January 1, 1990; December 31, 1990; August 1, 1990 (36 officers were promoted to lieutenant that day, see Reynolds I, at 3); or on every day of 1990?  This is not a nitpicking question since the promotions themselves that occurred in 1990 (and on other dates) could affect whether an underrepresentation of Hispanics continued to exist.  (Although Reynolds I and the jury's special verdicts considered Hispanic underrepresentation as of 1990, the racial promotion of one Hispanic may have occurred on September 16, 1991, which is one of the promotion dates and the date from which Dennis's backpay is computed.  See id. at 3; Reynolds I, Docket Entry 166 (judgment).)

Miller, & Edward H. Cooper, Federal Practice & Procedure § 4465 at 614-15 (1981).  Since estoppel will not be applied as to Issue (a), the factual underpinning for applying estoppel as to Issue (e) also does not exist.

Next to be considered is Issue (b).  Since the City's own statistical expert in Petit assumes no hiring discrimination occurred after 1975 (see Petit V, 2001 WL 629306 at *9) and since the City apparently stipulated to that fact in Reynolds, (see Reynolds I, at 16), it may be that the City would stipulate to Issue (b) even if it were not estopped from contesting it. However, since the parties apparently stipulated in Reynolds that no hiring discrimination existed after 1975, Issue (b) was not actually litigated.  See In re Cassidy, 892 F.2d 637, 640 n.1 (7th Cir.), cert. denied, 498 U.S. 812 (1990).  Compare also Kairys v. INS, 981 F.2d 937, 940-41 (7th Cir. 1992), cert. denied, 507 U.S. 1024 (1993).  Therefore, one of the elements of collateral estoppel is not satisfied and the City will not be estopped from contesting Issue (b).

Issue (c) is that, after 1975, the CPD's medical requirements for hiring patrol officers did not have a disparate impact on African-Americans.  There is no contention that this issue will not arise in the present litigation, though it may be redundant if the parties again stipulate that there was no hiring discrimination after 1975.  It also appears that the issue was actually litigated.  However, the issue was not essential to the

final judgment. In considering the evidence of under-representation of lieutenants in 1990, Reynolds I, at 16-17, discusses Siskin's statistical analysis, pre- and post-1975 differences in the treatment of African-Americans, and plaintiff's attempt to discount the statistical evidence. The court states in part: "Evidence was also presented showing that blacks were rejected on medical grounds greatly in excess of whites before 1975, but this disparity vanished after 1975." Id. at 16. The court does not expressly relate this evidence to the issue at hand. It apparently is an example of a pretextual ground for rejecting African-American applicants that was no longer used after 1975.[13] However, it does not appear to be a finding essential to concluding that African-American lieutenants were underrepresented as of 1990. The statistical evidence otherwise showed that there was at least a disparate impact on African-American hiring and there was other evidence of intentional discrimination against African-Americans.[14] See Reynolds II, at 3 ("parties also agreed that, with respect to the remedial defense, past racial discrimination in hiring was

---

[13]It is also possible that it was a disparate effect of a policy that was not intentionally discriminatory.

[14]If anything, it would appear that the finding regarding medical requirements was in aid of the City's ultimately successful contention that its racial promotion of African-Americans was justified by its remedial defense. In that case, collateral estoppel could not apply, only judicial estoppel. See Petit III, 1999 WL 66539 at *6.

established by the jury verdict").[15]  Again, given the City's
apparent position that discrimination in hiring did not exist
after 1975, it is unclear whether the City disputes that the
medical requirements did not adversely affect post-1975 African-
American hires.  However, because that finding was not essential
to the prior judgment, Issue (c) is not an issue on which
collateral estoppel is appropriate.

Issue (d) concerns derogatory comments and treatment of
women, both before and after 1975.  In discussing the evidence
supporting that women were discriminated against at the CPD,
Reynolds I, at 20, states:  "Further, there was evidence of
derogatory comments and treatment of women by supervisors or
tolerated by supervisors both before and after women were
permitted to become patrol officers in 1975."  Since this is only
part of the evidence supporting that women were discriminated
against, it cannot be assumed that it was essential to the
judgment that was entered.[16]  Collateral estoppel will not be
applied as regards Issue (d).

---

[15]Reynolds II makes no mention of the medical requirement
evidence which further supports that the finding was not
essential to the court's judgment regarding the promotion of
African-American lieutenants.

[16]Also, since the City was successful in proving that the
racial promotions of women were justified by its remedial
defense, judicial estoppel, not collateral estoppel, would
instead be the appropriate doctrine to invoke.   See Petit III,
1999 WL 66539 at *6.

The last issue to consider is whether the City is estopped from raising its operational needs defense in _Erwin_. The operational needs defense was actually litigated in _Reynolds_. In _Reynolds_, though, the City successfully proved that it was appropriate to promote to lieutenant, out of rank order, African-Americans and women as a remedy for the lingering effects of past discrimination against those two groups. Since the City was successful in otherwise justifying its promotion of African-Americans and women, the finding that its operational needs defense (as to those two groups) was not an adequate justification was not essential to the judgment entered in _Reynolds_. Therefore, in _Erwin_, the City cannot be estopped from raising its operational needs as a justification for the racial promotions of African-Americans and women.

The situation regarding the promotion of Hispanics is different. One plaintiff in _Reynolds_ obtained a recovery based on the fact that one Hispanic received a racial promotion in 1990 or 1991[17] which would instead have gone to that plaintiff. If the City had successfully proved its operational needs defense as regards the need to promote Hispanics, that plaintiff would not have been entitled to recover damages. Therefore, the finding that the racial promotion of one Hispanic was not justified by

---

[17]Consistent with the special verdict questions, the _Reynolds_ court focused on 1990 in determining if operational needs justified racial promotions. See _Reynolds I_, at 10-14. As indicated by the damages awarded to Dennis, though, the racial promotion of one Hispanic apparently occurred in 1991.

the City's operational needs was essential to the judgment entered in <u>Reynolds</u>. Again, however, that finding is limited to whether the operational needs existed in 1990. As to internal operational needs, the finding was specifically limited to the City's actual motivation (expressed in July 1990) for the out-of-rank-order promotions and the belief that, in 1990, there already enough Hispanic lieutenants to satisfy the CPD's internal operational needs. <u>Reynolds I</u>, at 10-11. No consideration was given to whether the prior promotions from the racially standardized 1988 list had been necessary to bring enough Hispanics into the lieutenant rank to satisfy the CPD's internal operational needs. Similarly, consideration of the CPD's external operational needs focused on the number of Hispanic lieutenants just prior to the 1990 out-of-rank-order promotions. See <u>id.</u> at 13. As with the finding regarding lingering effects of Hispanic discrimination as of 1990, the <u>Reynolds I</u> finding as to the operational needs defense related to Hispanics, if given a preclusive effect, would still leave related issues to be tried for the other years and regarding African-Americans and women. Applying collateral estoppel on the narrow issue of a defense to promoting Hispanics in 1990 would not save significant resources and might confuse the jury. Collateral estoppel will not be granted as to Issue (f). <u>See</u> Wright, Miller, & Cooper, § 4465 at 614-15.

IT IS THEREFORE ORDERED that plaintiffs' motions to compel 1987 revisionist lieutenant's promotion list [283-1, 285-1] and to identify expert witnesses for operational necessity defense [289-1] are denied without prejudice.  Plaintiffs' motions for collateral estoppel [286-1, 288-1] are denied.

ENTER:

_William T. Hart_
UNITED STATES DISTRICT JUDGE

DATED:  AUGUST 9 , 2001